THE NEW YORK FIREMEN'S INSURANCE COMPANY *v.* WALDEN and WALDEN, 12 J. R. 513.

In S. Ct. 12 id. 128.

*Barratry of Master ; Disclosure of Circumstances ; Materiality of, to the Risks Taken.*

THIS was an action on a policy of insurance, on the ship Suffolk, from Belfast to Lisbon, and thence to New York.

The vessel sailed from New Orleans for Belfast, in September, 1810, but on the way thither was obliged to put into the Havanna for a supply of water. While there, the master drew a bill for $800, on the plaintiffs below, which bill was not accepted or paid by them, for the reasons that they had had information from the captain that the vessel had put into the Havanna merely for water ; and the bill was unaccompanied with any account or information of repairs or supplies furnished the vessel there. After a short stay at Havanna, the vessel resumed her voyage for Belfast, but by reason of damage sustained in tempestuous weather, was compelled to put into Cork, where she arrived on the 18th of January, 1811, and having undergone thorough repairs, left there on the 26th of April, and arrived at Belfast on the 3d of May.

A letter was written by the agents of the ship, at Belfast, to C. & Co., of Liverpool, the plaintiffs' agents, on the 19th of March, 1811, stating that "a vessel had got foul of the S., and carried away her bowsprit ; that they feared the captain was careless of his business, and that his account of repairs and expenses would astonish them all ; that his detention had been very great, yet he seemed very easy under it."

This letter and one accompanying it, of very similar purport from C. & Co. of Liverpool, were received by the plaintiffs before insurance was effected ; but neither those nor the circumstance of the bill drawn at Havanna upon them, were communicated to the insurers.

The ship left Belfast on the 2d of July, with instructions to proceed to Lisbon, and from thence to New York. She arrived at Lisbon on the 14th of July, and having taken 80 moys of salt, for which the master gave a bill of lading to

deliver the same in New York, she left Lisbon on the 15th of August, after having cleared out for N. Y., and with verbal directions from the consignees at Lisbon, to proceed to New York.

The vessel, notwithstanding, was carried by the master to New Orleans: and after various suspicious acts, such as cutting away the cables close to the vessel, which had parted while she was at anchor, and a long and unnecessary detention at Matanzas, until the 29th of November, she finally arrived at New Orleans in December, 1811.

While at Matanzas, the captain hypothecated the vessel to one Drake, for $1,563 ; but how the debts which were thus secured had arisen, or how the money raised by the bottomry had been appropriated, did not appear. He likewise obtained advances on the salt, and gave a bill of lading for it to be delivered to one Morgan, at New Orleans.

When the vessel arrived there, the agent of the plaintiffs below, by their direction, demanded of the captain to deliver up the ship to them, which he refused to do; and the agent then proceeded in the District Court of the United States, to dispossess him. The ship was libelled, and sold under an order of the court for the benefit of all parties. The salt was claimed by Morgan, who attached it, and also the ship; and by order of the court, the salt was appraised and bonded by the plaintiffs' agent.

The plaintiffs below, claimed to recover on the ground of barratry of the master ; which barratry was in fact admitted on the argument in the Supreme Court. But the insurers contended that the insured were bound to communicate the information of the previous misconduct of the captain to them ; as set forth in the letters of their correspondents, &c., and that not having done so, the suppression vitiated the policy.

But the judge, at the circuit, charged the jury, that the evidence of barratry was conclusive ; and that "*the insured were not bound to communicate any of the letters, nor any of the circumstances within their knowledge, respecting the master of the ship.*"

The Supreme Court, on a motion for a new trial on the bill of exceptions in the case, held the charge of the judge

correct. Platt, J., in delivering the opinion of the court, says: "It would be unreasonably severe, and would defeat almost every policy of insurance against barratry, if the assured were held strictly bound to disclose every immoral act imputable to the master, and every unfavorable report which had reached their ears previous to signing the policy." "There must be some limit to this duty of making disclosures in such cases. It can not be necessary that the assured should give the underwriter a minute history of everything which they have known or heard touching the moral character of the intended master."

"If his general character be good, and the assured have no knowledge of any fact *impeaching the honesty* of the master, the charge of undue concealment has no legal foundation."

"In this case, the unfavorable opinions expressed in the letters of H. D. and H., (agents at Belfast,) and of C. & Co., respecting Captain Cartwright, were repelled by the evidence of his good character as a sailing master in New York, where he had long been known." Judgment was accordingly rendered for the plaintiffs below; whereupon the defendants brought their writ of error.

The Court of Errors *reversed* the judgment of the Supreme Court. The opinion of the court was delivered by Chancellor Kent. He says :

"The counsel went at large into the question, whether the assured were bound to communicate to the underwriters, at the time they applied for insurance, the letters and other knowledge they possessed of the improper conduct of the master. But it appears to me that this question is not for the decision of this court, because, whether the circumstances relative to the master ought to have been disclosed, depends upon the question, whether those circumstances were material to the risk; and the materiality is a question of fact for a jury, and not a question of law for the court. It is a well settled principle in the law of insurance, that what facts, in the knowledge of the assured, are material, and necessary to be communicated to the underwriter, when insurance is asked for, is for a jury to determine; and I will notice a few cases, in illustration of this point. My whole

opinion will rest upon the admission, and the solidity of this principle."

He then examines in this connection, the English cases of *Macdowal* v. *Fraser*, Doug. 260; *Shirley* v. *Wilkinson*, Doug. 306; *Willes* v. *Glover*, 4 B. and P. 14; and *Lyttledale* v. *Dixon*, 4 B. and P. 151; "where the Common Pleas," he says, "unanimously and very explicitly, declared their opinion that every material circumstance must be disclosed; but that it was for the jury to say, how far any given circumstance was material."

He next examines the American cases, and shows that *Livingston* v. *Delafield*, 1 J. R. 522; *Murgatroyd* v. *Crawford*, 3 Dallas, 491; adopt the same rule, adding, "And to conclude with the highest judicial authority in this country, the Supreme Court of the United States has decided, on two different occasions, *Livingston* v. *Maryland Insurance Company*, and *Maryland Insurance Company* v. *Rudens*, 6 Cranch, 274, 338; that the operation of any concealment on the policy, depends on its materiality to the risk, and that this materiality was a subject for the consideration of a jury, and must be left to them."

Some question having been raised on the argument, whether the language of the judge in this case, in his charge to the jury, was to be considered as a "positive direction in point of law, or mere advice on a matter of fact;" the Chancellor says, "The language of the learned judge was that "the plaintiffs were not *bound* or *required* to make the disclosure; that the matters offered in evidence were not *sufficient* to bar the action;" and nothing was said about the *weight of evidence* for the consideration of the jury. If even it was *doubtful*, by the bill of exceptions, whether the charge was intended as *direction* or otherwise, the result of my opinion would be the same; because, when the judge interposes his opinion to the jury on a point of fact, it ought not to be left in doubt in what light they are to receive his charge." "Every charge should distinguish clearly, between the law and the fact, so that the jury can not misunderstand their rights or their duty, nor mistake the opinion of the judge upon matter of fact, for his direction in point of law."

"If then, the charge of the learned judge is to be considered, as I think it must be, as a declaration to the jury that the papers and facts not disclosed, were in *judgment of law*, immaterial, then the jury have never passed their own judgment upon the materiality of those proofs, and the cause ought to be remanded to another jury."

The judgment of the Supreme Court was accordingly *reversed*, and a *venire de novo* awarded.

For *reversing* 10, for *aff.* 8.

---

☞ The Court of Errors held subsequently, in the case of the *American Insurance Company* v. *Dunham*, 15 Wend. 9, where a recovery was sought on the ground of a barratarious act of the master, and by the policy of insurance, the barratry of the master and mariners was insured against; that, notwithstanding the policy contained a warranty on the part of the assured against *illicit* or *prohibited* trade, and the vessel was condemned and lost in consequence of the master's *attempting an illicit trade by smuggling* a few articles in his possession, the underwriters were liable.

That such a warranty against illicit trade, is not broken, unless the illicit trade is carried on by the *assured* himself, or with his knowledge or assent; he is not otherwise affected by such acts of the master or mariners.

The judgment of the Supreme Court was accordingly *affirmed*.

See S. C. in S. Ct, 12 Wend. 463.